IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SUE-ANNA SHULTS SMITH,          )
                                )
        Plaintiff-Appellant,    )
                                )
        v.                      )
                                )
SUNTRUST BANK,                  )          1:15cv160
                                )
        Defendant-Appellee, and )
                                )
KENNETH DALE SMITH,             )
                                )
        Intervenor-Defendant.   )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

        This matter is before the court on appeal from an order of
the Bankruptcy Court dismissing an adversary proceeding.  (Doc.
18-13.)   The debtor, Sue-Anna Shults Smith, sought a declaration
that she had no obligation to repay a home equity line of credit
because her ex-husband, Intervenor-Defendant Kenneth Dale Smith,
forged her signature on the loan documents, and she asserted state-
law claims against SunTrust Bank ("SunTrust") arising out of its
conduct related  to the loan.  (Doc. 18-15.)  In a detailed twenty-
four-page memorandum opinion, the Bankruptcy Court concluded that
Ms. Smith ratified the loan and thus dismissed her adversary
complaint.  (Doc. 18-13.)  The Bankruptcy Court also denied Ms.
Smith's subsequent motion to amend the complaint to assert a claim
for recoupment.  (Doc. 7 at 29-30.)  Following this timely appeal,

the court heard argument on February 11, 2016. For the reasons that follow, the Bankruptcy Court's decisions to dismiss Ms. Smith's adversary complaint and to deny her motion to amend will be affirmed.

## I. BACKGROUND

When reviewing a motion to dismiss, the court construes the facts in the light most favorable to Ms. Smith as the non-moving party.

Mr. and Ms. Smith were married in 1978 (Doc. 18-15 ¶ 12)[1] and eventually owned a home in Bahama, North Carolina, as tenants by the entireties (Doc. 18-16 at 11)[2] subject to a mortgage and home equity line of credit (Doc. 18-15 ¶¶ 7-8). In 2002, Mr. Smith took out a second home equity line of credit with Central Carolina Bank (the "'4464 Loan"), which purported to be secured by a third-priority lien on the home. (Id. ¶¶ 7-8, 13.) Mr. Smith did so without Ms. Smith's knowledge or consent, forging her signature on the loan's originating documents. (Id. ¶ 13.) A loan officer for

---

[1] The parties did not include Ms. Smith's original complaint in the record on appeal but instead included her proposed amended complaint (Doc. 18-15), upon which the court relies for her factual allegations insofar as there appears to be no dispute that both complaints are identical, save for the addition of a claim for recoupment in the amended complaint. (See Doc. 11 at 15; Doc. 14 at 33-34.)

[2] Although courts are generally limited to the factual allegations in the complaint when evaluating motions under Rule 12(b)(6), they may also consider documents attached to the complaint or motion to dismiss so long as they are "integral to the complaint and authentic." Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007).

2

Central Carolina Bank notarized the forged signature. (See id. ¶¶ 10, 15–17.) SunTrust later absorbed Central Carolina Bank via merger. (Id. ¶ 16.)

In 2007, Ms. Smith filed for divorce after learning of the '4464 Loan and Mr. Smith's forgery. (See Doc. 18-4 at 1-2.) The parties entered into a mediated Settlement Agreement, which was incorporated into a court order by the Family Court in Durham County, North Carolina (the "Settlement Agreement"). (Id. at 26–29.)[3] Under the Settlement Agreement, Ms. Smith was granted "sole possession and ownership" of the couple's house and farm (id. at 27), and Mr. Smith agreed to sign a deed transferring the house and farm to Ms. Smith (id. at 28). Ms. Smith agreed to bring the mortgage and first home equity line current and to make all future monthly payments on them. (Id. at 27–28.) Mr. Smith agreed to make the monthly payments on the '4464 Loan, but only for up to twelve months. (See id. at 27-28.) Ms. Smith agreed to engage a new realtor to sell the house. (Id. at 28.) Upon the sale of the house, the remaining balance of the '4464 Loan was to be paid from the proceeds, with any excess belonging to Ms. Smith. (Id.)

The home did not sell within twelve months of the Settlement Agreement. (See Doc. 18-15 ¶ 9.) As a result, in September 2008

---

[3] Ms. Smith was represented by counsel during the divorce proceedings and negotiations culminating in the Settlement Agreement. (See Doc. 18-4 at 6, 26.)

Ms. Smith, who had sole ownership of the house, began making monthly payments to SunTrust on the '4464 Loan. (See id. ¶ 46.) She continued to do so through 2011, when she entered into a Modification Agreement with SunTrust. (See Doc. 18-16 at 5-6.) Under the Modification Agreement, SunTrust agreed to temporarily lower the interest rate on the '4464 Loan. (See id. at 5-6, 13.) The Modification Agreement lists Ms. Smith as the only borrower and acknowledges that "there are no defenses, adjustments, or offsets" to her obligation to pay the loan. (Id. at 5-6.)

Ms. Smith stopped making payments on the '4464 Loan in March 2012. (Doc. 18-15 ¶ 46.) As a result, Mr. Smith initiated contempt proceedings in Family Court, claiming that his credit score had been negatively impacted by Ms. Smith's default. (See Doc. 18-4 at 30-34.) In August 2013, the Family Court held Ms. Smith in contempt for failing to abide by the terms of the Settlement Agreement (the "Contempt Order"). (Id.) In the Contempt Order, the Family Court concluded: "The fact that [Mr. Smith] signed [Ms. Smith's] name to secure [the '4464 Loan] cannot be used as a defense to [Mr. Smith's] Motion for Contempt" because Ms. Smith "knew of the same prior to her agreeing to sign the [Settlement Agreement]." (Id. at 31.) The Family Court ordered Ms. Smith to bring all payments on the '4464 Loan current within sixty days and to re-list the home for sale. (Id. at 33.) The Family Court also sentenced Ms. Smith to thirty days in the Durham

4

County Jail but suspended the sentence so long as Ms. Smith complied with the Contempt Order. (Id. at 33–34.)

Ms. Smith filed for bankruptcy protection shortly thereafter.[4] SunTrust filed a secured claim for $79,160.57 for the unpaid balance of the '4464 Loan. (Doc. 18-16 at 1–11.) In response, Ms. Smith filed this adversary proceeding against SunTrust, claiming that the '4464 Loan was not enforceable against her and seeking damages for unjust enrichment, unfair and deceptive trade practices under various North Carolina laws, and violations of the North Carolina Debt Collection Act, N.C. Gen. Stat. § 75-55. (See Doc. 18-15.) The home was sold at the Bankruptcy Court's direction, leaving $55,871.93 in proceeds after the mortgage and first home equity line were paid. (Id. ¶ 9.) That balance was placed in trust pending the outcome of this adversary proceeding. (Id.)

On December 8, 2014, the Bankruptcy Court entered a detailed memorandum opinion and dismissed Ms. Smith's adversary complaint, concluding that she ratified the '4464 Loan through the Settlement Agreement and her subsequent conduct. (Doc. 18-13 at 14–24.) As a result, the court held that Ms. Smith was estopped from denying liability under the '4464 Loan, and it ordered that the excess sale proceeds held in trust be distributed to SunTrust. (Id.)

_____

[4] Ms. Smith's bankruptcy filing automatically stayed proceedings related to the Contempt Order. (Doc. 18-13 at 8.)

The Bankruptcy Court also denied Ms. Smith's subsequent motion for leave to amend her complaint to add a claim for recoupment. (Doc. 7 at 29-30.) This appeal followed.

## II. ANALYSIS

This court exercises jurisdiction pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8003. On appeal from a bankruptcy proceeding, this court reviews the Bankruptcy Court's legal conclusions de novo and its factual findings for clear error. <u>Jenkins v. Simpson (In re Jenkins)</u>, 784 F.3d 230, 234 (4th Cir. 2015).

### A. <u>Rooker-Feldman</u>

As an initial matter, SunTrust argues that this court lacks jurisdiction under the <u>Rooker-Feldman</u> doctrine. The court reviews this legal question de novo. <u>See</u> <u>Jenkins</u>, 784 F.3d at 234.[5]

The <u>Rooker-Feldman</u> doctrine is a jurisdictional bar that "prohibits the United States District Courts, with the exception of habeas corpus actions, from 'sit[ting] in direct review of state court decisions.'" <u>Jordahl v. Democratic Party of Va.</u>, 122 F.3d 192, 199 (4th Cir. 1997) (quoting <u>D.C. Court of Appeals v. Feldman</u>, 460 U.S. 462, 482 n.16 (1983)). "The doctrine extends not only to constitutional claims presented or adjudicated by the state courts

---

[5] The Bankruptcy Court did not directly address this issue, but it necessarily concluded that <u>Rooker-Feldman</u> does not apply by reaching the merits of Ms. Smith's claims. (<u>See</u> Doc. 18-13 at 12-24.)

but also to claims that are 'inextricably intertwined' with a state court judgment." Id. (quoting Feldman, 460 U.S. at 486–87). The Supreme Court has clarified that Rooker-Feldman "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

SunTrust contends that Ms. Smith's adversary proceeding constitutes an impermissible attempt to review the Contempt Order, which concluded that Ms. Smith could not use Mr. Smith's forgery as a defense to her agreement to make the payments on the '4464 Loan. The court disagrees. In the Contempt Order, the Family Court held that Ms. Smith violated her obligations to Mr. Smith under the Settlement Agreement. (See Doc. 18-4 at 30–34.) Because SunTrust was not a party to the Settlement Agreement (see id. at 26–29), the Family Court did not (and could not) address whether or not Ms. Smith also violated any obligations to the bank. Moreover, Ms. Smith does not seek to modify her obligations to Mr. Smith or to overturn or enjoin the Contempt Order. In other words, Ms. Smith's adversary proceeding does not challenge the Contempt Order or seek redress for an injury caused by it. As a result, Rooker-Feldman does not apply. See Davani v. Va. Dep't of Transp.,

7

434 F.3d 712, 718–19 (4th Cir. 2006) ("Exxon requires us to examine whether the state-court loser who files suit in federal district court seeks redress for an injury caused by the state-court decision itself. If he is not challenging the state-court decision, the Rooker-Feldman doctrine does not apply.").

**B.    Ratification of the '4464 Loan**

Ms. Smith first challenges the Bankruptcy Court's conclusion that she ratified the '4464 Loan. On appeal from a bankruptcy proceeding, the court reviews an order granting a motion to dismiss for failure to state a claim de novo. See Gerner v. Cty. of Chesterfield, Va., 674 F.3d 264, 266 (4th Cir. 2012).

"Ratification is defined as 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'" Am. Travel Corp. v. Cent. Carolina Bank & Tr. Co., 57 N.C. App. 437, 442, 291 S.E.2d 892, 895 (1982) (quoting Restatement (Second) of Agency § 82 (1958)). In order to ratify an agreement, a party must have "full knowledge of all material facts relative to the unauthorized transaction." Carolina Equip. & Parts Co. v. Anders, 265 N.C. 393, 400–01, 144 S.E.2d 252, 258 (1965).

Ratification may be express or implied through the principal's conduct. Am. Travel Corp., 57 N.C. App. at 442, 291 S.E.2d at 895. "However, to constitute ratification as a matter

8

of law, the conduct must be consistent with an intent to affirm the unauthorized act and inconsistent with any other purpose." Id. at 443, 291 S.E.2d at 896. For example, a party ratifies an otherwise voidable contract when she "accepts benefits and performs under [the] agreement." Goodwin v. Webb, 152 N.C. App. 650, 656, 568 S.E.2d 311, 315 (2002) (Greene, J. dissenting), rev'd per curiam for the reasons stated in the dissent, 357 N.C. 40, 577 S.E.2d 621 (2003); see also Nisselson v. Softbank Am. Corp. (In re Marketxt Holdings Corp.), 361 B.R. 369, 402 (Bankr. S.D.N.Y 2007) (stating that a party may ratify an agreement by "intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it") (citations and internal quotation marks omitted); Carolina Equip. & Parts Co., 265 N.C. at 401, 144 S.E.2d at 258 ("It is also a settled principle of ratification that the principal must ratify the whole of his agent's unauthorized act or not at all. He cannot accept its benefits and repudiate its burdens." (citations omitted)).

Under North Carolina law, ratification typically arises in the domestic context where one party to an otherwise voidable obligation contained in a divorce-related agreement accepts its benefits and performs pursuant to its terms. See, e.g., Lowry v. Lowry, 99 N.C. App. 246, 253, 393 S.E.2d 141, 145 (1990)

9

("[P]laintiff, by signing the agreement, having it incorporated into a consent judgment and consent order, and receiving the benefits of the Agreement for almost three years, ratified the Separation Agreement."); Hill v. Hill, 94 N.C. App. 474, 479, 380 S.E.2d 540, 544 (1989) ("The materials before us plainly show that the wife has continued to accept the benefits of both agreements long after she became aware of the alleged wrongdoing. She cannot now avoid the same contracts she acquiesced in for months and the benefits of which she still enjoys."); Ridings v. Ridings, 55 N.C. App. 630, 632–33, 286 S.E.2d 614, 616 (1982) (holding that an ex-husband ratified his obligations under a settlement agreement procured by undue influence when he accepted sole ownership of marital property and made alimony payments after the undue influence subsided). Here, the question is slightly different: whether Ms. Smith ratified the '4464 Loan as a matter of law through the Settlement Agreement and through her subsequent conduct. Based on the record, the court finds that she did.

When Ms. Smith signed the judicially-enforceable Settlement Agreement to pay the balance of the '4464 Loan (see Doc. 18-4 at 27–28), she knew that Mr. Smith had forged her signature on the loan (Doc. 11 at 19). She did so, however, in exchange for receiving sole title to the property (see id. at 27), which she had previously shared with Mr. Smith as tenants by the entireties (Doc. 18-16 at 11). In doing so, she acknowledged that the '4464

10

Loan was an "encumbrance" on the house. (Doc. 18-4 at 28.) An encumbrance is "[a] claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage." *Encumbrance*, Black's Law Dictionary (10th ed. 2014). Thus, Ms. Smith agreed to pay the '4464 Loan and acknowledged that it (and her obligation to pay) would be secured by a valid lien on the house. This was important because, under North Carolina law a loan could encumber a property held by tenants by the entireties only if both spouses authorized the lien. L&M Gas Co. v. Leggett, 273 N.C. 547, 550-551, 161 S.E.2d 23, 26 (1968) ("The husband cannot convey, incumber, or at all prejudice, such estate to any greater extent than if it rested in the wife exclusively in her own right. The unity of husband and wife as one person . . . prevents the disposition of it otherwise than jointly."). In light of the fact that Ms. Smith received sole title to the property in the Settlement Agreement, her acknowledgment of encumbrance is wholly inconsistent with a claim that she sought to preserve her right to contest her signature on the loan but rather confirms the validity of SunTrust's lien.

Further, although the '4464 Loan proceeds had initially been paid to Mr. Smith, Ms. Smith benefitted from the loan as part of the Settlement Agreement insofar as she received (from the pot of all of the couple's assets and liabilities) sole title to the house and farm and the balance of all equity after the lenders were paid

11

(see Doc. 18-4 at 27-28), a fact that her counsel conceded during oral argument. Moreover, after accepting these benefits, Ms. Smith repeatedly made monthly payments on the '4464 Loan for over three years, not to Mr. Smith as reimbursement, but directly to SunTrust. (Doc. 18-15 ¶ 46.)

Collectively, Ms. Smith's entry into the Settlement Agreement, acceptance of benefits from the '4464 Loan, and subsequent performance of the loan obligation are consistent with affirmance of the '4464 Loan obligation and inconsistent with any purpose other than ratification.

Ms. Smith argues that the Settlement Agreement only created personal obligations between her and Mr. Smith and therefore cannot qualify as a ratification with respect to SunTrust, a third party. This argument is unpersuasive. As both the Bankruptcy Court and the Family Court concluded (see Doc. 18-13 at 16 n.9; Doc. 18-4 at 31), the language of the Settlement Agreement is not reasonably susceptible to Ms. Smith's interpretation. The Settlement Agreement provided that Ms. Smith was to receive "sole possession and ownership" of the house, subject to the '4464 Loan, which was an "encumbrance" against it. (See Doc. 18-4 at 27-28 (requiring Mr. Smith to sign over title to the house and farm).) The Bankruptcy Court correctly noted that insofar as Mr. Smith was responsible for making only the first twelve monthly payments on the '4464 Loan, unless the home was sold, and insofar as Ms. Smith

12

agreed to pay off the loan from the sale proceeds, it is "illogical to interpret the order and agreement in a way that, after 12 months, neither party would have an obligation to pay the loan secured by the 'encumbrance.'" (Doc. 18-13 at 16 n.9.) The parties' conduct confirms this interpretation; for over three years thereafter Ms. Smith repeatedly made payments on the '4464 Loan directly to SunTrust, rather than advancing funds to Mr. Smith. (Doc. 18-15 ¶ 46.) This conduct is inconsistent with any purpose other than ratification of the '4464 Loan.[6]

Ms. Smith also contends that she could not have ratified the '4464 Loan because she did not learn the extent of the loan officer's participation in the forgery until sometime after she entered into the Settlement Agreement. She argues that "the originating bank's degree of culpability in the forgery is material to determine whether [she] should waive her rights against the bank." (Doc. 11 at 19.) She further contends that "it was not until the North Carolina Secretary of State's Notary Division completed its investigation five (5) years after the [Settlement Agreement] that [Ms. Smith] could have enjoyed at least a tepid window into the originating bank's acts or omissions that resulted

_____

[6] This conclusion is not negated by the fact that Ms. Smith also initiated fraud investigations related to the '4464 Loan in 2009. (See Doc. 18-15 ¶ 22.) Ms. Smith made payments on the '4464 Loan for more than a year before filing complaints regarding the forgery, and she continued to make payments for more than two years thereafter. (See id. ¶¶ 22, 46.)

13

in the forgery." (Id.) This argument fails as well.

Ms. Smith concedes that by the time she entered into the Settlement Agreement, she knew that her ex-husband had forged her name and that the bank had made the loan to him. (Id.) These were the material facts necessary for her to know that she would not be bound by the forgery unless she ratified the agreement. See Wachovia Bank & Tr. Co. v. Turner, 202 N.C. 162, 163, 162 S.E. 221, 221 (1932) (stating that a defendant would not be liable for a promissory note executed by her husband if the husband forged the defendant's signature or signed the note without her authority); L&M Gas Co., 273 N.C. at 550-551, 161 S.E.2d at 26 ("The husband cannot convey, incumber, or at all prejudice, such estate to any greater extent than if it rested in the wife exclusively in her own right. The unity of husband and wife as one person . . . prevents the disposition of it otherwise than jointly."). This is especially true where Ms. Smith was represented by counsel throughout her divorce and negotiations leading to the Settlement Agreement. (See Doc. 18-4 at 6, 26.) Ms. Smith has failed to explain how the notary's participation in the forgery could be material to her decision to ratify or reject the '4464 Loan where it had no bearing on the loan's terms or her knowledge that she did not participate in its signing. See Ehrenhaus v. Baker, 216 N.C. App. 59, 88, 717 S.E.2d 9, 28 (2011) (stating in a different context that a fact is material if there

14

is a substantial likelihood that a reasonable person would consider it important in making a decision); Davis v. Egerton (In re U-Fill'Er-Up, Inc.), No. CIV 2:95cv95, 1996 WL 33676773, at *5 (M.D.N.C. Mar. 1, 1996) ("The standard for identifying a 'material fact' changes depending on the context in which the term is used, but it means, essentially, a fact that could make a difference to someone who must decide." (citations omitted)).[7]

In sum, while the '4464 Loan was initially voidable as to Ms. Smith due to Mr. Smith's forgery and the bank's complicity, Ms. Smith ratified the loan through the Settlement Agreement (in which she acknowledged it was an "encumbrance" on the home) and her

---

[7] Of course, Ms. Smith ratified the '4464 Loan yet again in the Modification Agreement in 2011. In accepting the more favorable terms (lower interest rate) in the Modification Agreement, Ms. Smith confirmed that she was personally liable for the '4464 Loan, that her personal obligations were not subject to any "defenses, adjustments, or offsets," and that these obligations were secured by a valid lien on her home. (See Doc. 18-16 at 5-6.) These acknowledgements are consistent with her prior ratification and are thoroughly inconsistent with any position other than an intent to be bound by the '4464 Loan, a point Ms. Smith essentially conceded both in her brief (see Doc. 11 at 26) and at oral argument. Because Ms. Smith clearly ratified the '4464 Loan before the Modification Agreement, the court need not reach her alternative argument that her affirmative claims survive because she only entered into the modification to delay foreclosure on the home. As to that claim, however, it is noteworthy that the Bankruptcy Court concluded that Ms. Smith's motives do not "vitiate her unambiguous ratification" of the '4464 Loan. (See Doc. 18-13 at 23); see also Metzger v. Hardey (In re Hardey), No. 04-10199-SSM, 2005 Bankr. LEXIS 2030, at *32 (Bankr. E.D. Va. Apr. 13, 2005) ("It is true that as between [the debtor] and Woodsboro Bank, her reasons for signing the modification agreement would have been immaterial, and that under state law she could not have defended against a subsequent foreclosure based on the original forgery.") (applying Virginia law).

subsequent conduct. Ms. Smith knew all of the material facts relating to the forgery and her liability as early as 2007, received the loan's benefits in the property distribution directed by the Settlement Agreement, and began performing under the '4464 Loan by making payments directly to SunTrust over the course of several years. Her actions are comprehensively inconsistent with any position other than an intent to ratify the '4464 Loan. As a result, the Bankruptcy Court did not err in reaching that result.[8]

### C.  Recoupment

Ms. Smith also challenges the Bankruptcy Court's denial of her motion for leave to amend her adversary complaint to add a claim for recoupment. This court reviews the Bankruptcy Court's denial of a motion for leave to amend for abuse of discretion. See Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 630 (4th Cir. 2008). Leave to amend should be freely granted when justice so requires. Fed. R. Civ. P. 15(a)(2). "A motion to amend should be denied only where it would be prejudicial, there has been bad faith, or the amendment would be futile." Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008).

"Ordinarily, a party who has been fraudulently induced to enter a contract or sale has a choice of remedies." Daniel Boone

---

[8] This conclusion should not be read to condone the bank's conduct. Falsely notarizing the signature of a borrower would be plainly deceptive.

Complex, Inc. v. Furst, 43 N.C. App. 95, 104, 258 S.E.2d 379, 387 (1979).  She may rescind the contract; or she may ratify it, "keeping whatever property or advantage [s]he has derived under it, and may recover in an action for deceit the damages caused by the fraud." Id.  The latter option can be accomplished through a claim for recoupment, which permits the ratifying party to recover the pecuniary injury inflicted upon her by the wrong.  Holt v. Holt, 232 N.C. 497, 501, 61 S.E.2d 448, 452 (1950).  Recoupment claims arise when there is a problem with the transaction that gave rise to a debt.  See RL Regi N.C., LLC v. Lighthouse Cove, LLC, 229 N.C. App. 71, 79, 748 S.E.2d 723, 728 (2013) ("Recoupment allows a defendant to defend against a claim by asserting – up to the amount of the claim – the defendants own claim against the plaintiff growing out of the same transaction." (citations omitted)), rev'd on other grounds, 367 N.C. 425 (2014); Van Gilder v. Bullen, 159 N.C. 235,[9] 238, 74 S.E. 1059, 1061 (1912) (approving recoupment for a party who was fraudulently induced to purchase real property subject to a mortgage); Frick Co. v. Shelton, 197 N.C. 296, 297, 148 S.E. 318, 318–19 (1929) (approving recoupment for a party who was fraudulently induced to purchase personal property subject to a mortgage).

---

[9] This case starts on page 235 of the North Carolina Reports, but the table of cases incorrectly states that it starts on page 291, and Westlaw and Lexis have picked up that error in their databases.

Recoupment claims typically involve a defect in the consideration that forms the subject of the contract. As a result, recoupment damages generally "consist of the difference between the value of the property sold as it was and as it would have been if it had come up to the fraudulent representations." Hutchins v. Davis, 230 N.C. 67, 73, 52 S.E.2d 210, 214 (1949). In Van Gilder, for example, a party was defrauded into purchasing what he believed to be a fee simple in a parcel of land subject to a mortgage, when he actually purchased only a life estate. See 159 N.C. at 236, 74 S.E. at 1060-61. Although the defrauded party ratified the contract, the North Carolina Supreme Court held that he was nevertheless entitled to damages in "the amount paid out . . . to make his title as it was represented to be," that is, the difference between the value of a life estate and the value of a fee simple. Id. at 238, 74 S.E. at 1061. Similarly, in Frick Co., a party was defrauded into purchasing defective milling equipment in exchange for a promissory note. 197 N.C. at 296, 148 S.E. at 318. After the defrauded party ratified the contract, the court held that "the measure of damages is the difference between the value of the article as warranted and the value of the article as delivered." Id. at 297, 148 S.E. at 318-19.

Here, Ms. Smith argues that, if she ratified the '4464 Loan, she is entitled to recoup damages she claims to have suffered as a result of fraud in the execution of the originating loan

18

documents.   Specifically, her proposed amended complaint seeks damages equaling the "difference between the Loan amount she ratified and the amount of the Loan proceeds she has actually received," as well as damages for "severe emotional distress." (Doc. 18-15 ¶ 80.)   Because Ms. Smith claims that Mr. Smith received the entirety of the '4464 Loan proceeds (<u>see</u> <u>id.</u> ¶ 78), she effectively seeks to nullify her ratification by claiming a right to recoup the full value of the '4464 Loan.   Ms. Smith cites no precedent for such a far-reaching result, and the court is not inclined to create one here.   Although the '4464 Loan obligated both Mr. and Ms. Smith, it permitted SunTrust to extend credit to "any or either of them."   (<u>See</u> Doc. 18-16 at 7; <u>see also</u> <u>id.</u> at 13.)   Ms. Smith cannot claim a right to "recoup" the '4464 Loan when the agreement she ratified did not give her a personal right to receive those funds.

To the extent that Ms. Smith has a legal or equitable claim on some portion of the funds that SunTrust loaned to Mr. Smith, the appropriate course would be to assert that claim against the party in possession of those funds: Mr. Smith.   As she conceded at oral argument, Ms. Smith cannot do so because she waived any such claim against her ex-husband – such as conversion of marital property – as part of the Settlement Agreement.   Her share of the '4464 Loan was negotiated as part of the couple's equitable distribution of all their assets and liabilities.   Regardless of

19

whether it was wise to ratify the loan in exchange for her property distribution, she knowingly entered the deal and received the benefits she bargained for when she ratified the '4464 Loan.

Ms. Smith's demand for emotional distress damages is similarly flawed. Ms. Smith alleges that the bank fraudulently notarized Mr. Smith's forgery "for the purpose of indebting" Ms. Smith, and that she suffered "severe emotional distress" as a result. (Doc. 18-15 ¶ 75, 80.) True, emotional distress damages may be recovered as part of a fraud claim. Williams v. HomEq Serv. Corp., 184 N.C. App. 413, 424, 646 S.E.2d 381, 388 (2007). But Ms. Smith does not assert a fraud claim in this case,[10] and she cites no authority for the proposition that a party may recover emotional distress damages in connection with a claim for recoupment.[11]

When fully contemplated, the recoupment claim offers only an ersatz aura of substance. Ms. Smith's attempt to "recoup" the

---

[10] Nor does it appear that she could assert a fraud claim against SunTrust, as she does not claim to have been deceived by the forgery. See Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974) (listing actual deception as an element of a fraud claim).

[11] No party has addressed whether in the Modification Agreement Ms. Smith waived any claim for recoupment she may have had against SunTrust in exchange for a lower interest rate and other benefits associated with the modification. (See Doc. 18-6 at 5–6.) In the Modification Agreement, Ms. Smith acknowledged that she had "no defenses, adjustments, or offsets" to her obligation to pay the '4464 Loan. (Doc. 18-16 at 5.) Recoupment claims function as a defense or offset to liability. See RL Regi N.C., LLC, 229 N.C. App. at 79, 748 S.E.2d at 728 (2013). Because waiver is a defense that must be asserted, the court declines to reach the question here.

full value of the '4464 Loan would effectively nullify her ratification and bypass her obligation to state a valid, stand-alone basis for recovering the emotional distress damages she seeks. In light of all these pleading deficiencies, the Bankruptcy Court did not abuse its discretion in concluding that Ms. Smith's proposed amendment to her complaint would be futile.

Ms. Smith cannot complain that this result is unfair. While Mr. Smith acted deceptively in signing her name to the '4464 Loan and the bank acted wrongly in accepting and notarizing her purported signature, and while Ms. Smith had options for recovery against both for that misconduct, she swapped them for what she and Mr. Smith bargained for and received in the Settlement Agreement.

## III. CONCLUSION

For the foregoing reasons, therefore, the orders of the Bankruptcy Court dismissing Ms. Smith's adversary complaint and denying her motion to amend are AFFIRMED.

_____/s/   Thomas D. Schroeder_
United States District Judge

March 8, 2016